UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JAMES SILAS, | ) |
|     *Petitioner*, | ) ) ) |
| v. | ) ) Case No.: 1:22-cv-230 |
| UNITED STATES OF AMERICA, | ) ) ) Judge Curtis L. Collier |
|     *Respondent*. | ) |

**M E M O R A N D U M**

Before the Court is a motion by Petitioner, James Silas, to vacate his sentence under 28 U.S.C. § 2255. (Doc. 1.) The United States (the "Government") has responded in opposition (Doc. 6), and Petitioner has replied (Doc. 9). The matter is now ripe for review.

**I.    BACKGROUND[1]**

On October 25, 2016, Petitioner and eight codefendants were indicted by a federal grand jury in the Eastern District of Tennessee and charged with, among other things, conspiring to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (Doc. 1.)

An investigation of the charged conspiracy began as early as August 2015. (Doc. 146-2 at 11.) Through several cooperating individuals, detectives from the Hamilton County Sheriff's Office and task force officers from the Drug Enforcement Administration ("DEA") obtained information that Defendant Eberhardt was engaging in large-scale distribution of heroin and marijuana in East Tennessee and that Eberhardt had sources of heroin supply from Petitioner out of Chicago, Illinois. (*Id.*) All defendants except for Petitioner elected not to go to trial and pleaded

---

[1] The background section cites to the related criminal case, 1:16-cr-124-CLC-CHS.

guilty to conspiracy to distribute one kilogram or more of heroin, or a lesser included offense. (Docs. 190, 192, 275, 300, 421, 461, 463, 465.)

Leading up to Petitioner's trial, the Government notified Petitioner of its intent to present evidence at trial that Petitioner utilized the Mafia Insane Vice Lords ("Vice Lords"), a criminal gang based out of Chicago, Illinois, to facilitate his drug trafficking activity. (Doc. 344-1.) The Government anticipated the evidence at trial would establish that Petitioner became the national leader and assumed control of the Vice Lords when Troy Martin, also known as the "King" of the Vice Lords, went to prison in 2007 for drug trafficking. (Doc. 344 at 2.) The Government represented that wiretapped calls showed that Petitioner—who was often referred to as "P" and "Prince" by his codefendants—had a substantial role in the conspiracy. (*Id*. at 3.)

Following this notice, Petitioner moved in limine to prohibit evidence regarding the Vice Lords and his involvement with the gang at trial. (Doc. 325.) Specifically, Petitioner asked the Court to exclude any evidence about his rank, the meaning of "P" or "Prince," the Vice Lords "King," and gang dues. (Doc. 326 at 1–3.) The Court granted "the motion as to evidence concerning [Petitioner's] rank in Vice Lords and the meaning of 'P' or 'Prince,' evidence concerning the paying of gang 'dues,' and evidence concerning the Vice Lords 'King.'" (Doc. 380 at 15–16.) The Court denied the motion, however, as to evidence about the affiliation of Petitioner and his coconspirators with the Vice Lords. (*Id*. at 16.) The Court noted that Petitioner's rank in a gang organization would prejudice the jury but determined that the Government could still offer evidence of "how the purported co-conspirators may have come to know each other." (*Id*. at 9.) The Court explained the Government could present evidence that Petitioner was known as his nicknames, "P" and "Prince", so long as it did so "without reference to how the nickname relates to [Petitioner's] alleged rank within the Vice Lords." (*Id*. at 10.)

2

Defendant's case was tried before a jury from November 5, 2018, until November 13, 2018. (Docs. 393–396.) At the conclusion of the trial, the jury found Petitioner guilty of conspiracy to knowingly and intentionally distribute one kilogram or more of heroin. (Doc. 397.) On May 15, 2019, this Court sentenced Petitioner to 360 months of imprisonment with five years of supervised release to follow. (Doc. 501 at 2–3.) Petitioner appealed his conviction and sentence, and on October 1, 2020, the Court of Appeals for the Sixth Circuit affirmed this Court's judgment. (Doc. 560.) The Court of Appeal denied Petitioner's motion for rehearing. (Doc. 630-8.)

Pursuant to 28 U.S.C. § 2255, Petitioner now alleges prosecutorial misconduct and ineffective assistance of his trial counsel and moves the Court to vacate his conviction and sentence and order a new trial. (Doc. 630.)

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside, or correct a sentence when the sentence imposed was in violation of the Constitution or federal law, the court was without jurisdiction to impose such a sentence, the sentence was in excess of the maximum authorized by law, or the sentence is otherwise subject to collateral attack. To prevail on a § 2255 motion, the petitioner "must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185–86 (1979)). Thus, "a petitioner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). This is in line with the historic meaning of habeas corpus, which is "to afford relief to those whom society has 'grievously wronged.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## II. DISCUSSION

As a preliminary matter, the Court addresses the timeliness of the petition. This Court sentenced Petitioner on May 15, 2019. (Case 1:16-cr-124, Doc. 501.) Petitioner appealed the sentence on May 22, 2019. (*Id*., Doc. 505.) The Court of Appeals for the Sixth Circuit affirmed the Court's judgment and issued a mandate on April 21, 2021. (*Id*., Docs. 560 & 598.) Petitioner did not file a petition for writ of certiorari. Because his judgment of conviction became final on September 20, 2021—the expiration date to file a writ of certiorari—Petitioner's deadline to file a § 2255 petition was one year afterwards on September 20, 2022.[2] *See* 28 U.S.C. § 2255(f)(1). Petitioner filed his § 2255 petition on September 8, 2022, and his petition is therefore timely. (*Id.*, Doc. 630).

In support of his § 2255 petition, Petitioner raises two grounds for relief. He first contends the Government committed prosecutorial misconduct "by having its witnesses refer to [Petitioner] as the 'Prince' or 'P' over one hundred times, effectively running roughshod over this Court's Order in limine." (Doc. 2 at 14.) He second contends his trial counsel was constitutionally ineffective "for failing to object to the Government's repeated violations of this [] Court's in limine order and for repeated utterances of 'The Prince' or 'The P.'" (*Id*. at 25.) The Court will address each argument in turn. Because the prosecutorial-misconduct claim depends in part on Petitioner's claim for ineffective assistance of counsel, the Court will first address the ineffective-assistance claim.

---

[2] As Petitioner correctly notes, in the midst of the COVID-19 pandemic, the Supreme Court of the United States issued a temporary order extending the time to file a certiorari petition from 90 days to 150 days. (Doc. 11 at 4–5.)

4

### A. Ineffective Assistance of Counsel

Petitioner alleges ineffective assistance of counsel because his counsel "repeatedly failed to object to the prosecutor's improper statements." (Doc. 9 at 13.) "Not only did [s]he let the improper statements reach the jury uncontested, but [s]he also failed to preserve the issue of prosecutorial misconduct for appeal." (*Id.*)

The Sixth Amendment provides, in pertinent part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel. *Id.* at 687. Petitioner bears the burden of showing, first, "that his counsel provided deficient performance," and second, that "the deficient performance prejudiced [his] defense." *Sylvester v. United States*, 868 F.3d 503, 509–10 (6th Cir. 2017) (citing *Strickland*, 466 U.S. at 687).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Sims v. Livesay*, 970 F.2d 1575, 1580 (6th Cir. 1992) ("The court should begin with a strong presumption that counsel's conduct falls within the wide range of

5

reasonable professional assistance." (internal quotations and citations omitted)). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022) (quoting *Harrington v. Richter*, 562 U.S. 86, 110 (2011)).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The Supreme Court emphasized a claimant must establish both prongs in order to meet his burden, and if either prong is not satisfied the claim must be rejected.

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland*, 466 U.S. at 697.

### 1. Deficient Performance

Petitioner first argues his trial counsel was deficient because she "repeatedly" failed to object to the Government's "pattern of repeated misconduct," which was using Petitioner's nickname in front of the jury. (Doc. 9 at 5–8.) Petitioner contends the Government violated the Court's in-limine Order by referring to Petitioner as his nicknames of "Prince" or "P" more than one hundred times to "constantly remind[]" the jury that "he held a high-ranking position within the Mafia Insane Vice Lords." (Doc. 2 at 26.) According to Petitioner, the Government

6

Case 1:22-cv-00230-CLC-CHS   Document 13   Filed 09/09/25   Page 6 of 15   PageID #: 1017

"constructively referred to his rank" within the Vice Lords to "enable[] the jury to find [him] guilty by association." (*Id*.)  Petitioner argues, "[t]rial counsel's inexplicable decision to stand mute while the Government ran roughshod over this Court's in limine order was objectively unreasonable and prejudiced [Petitioner]." (*Id*.)

The Government responds by arguing trial counsel's failure to object was not deficient because "all of the references to petitioner's nicknames were relevant, material, and admissible," as allowed by the Court's in-limine Order. (Doc. 6 at 8.)  It contends, "[t]he Court made clear that the United States could present evidence that petitioner was known as 'P' or 'Prince'—so long as it did so 'without reference to how the nickname relate[d] to [his] alleged rank within the Vice Lords'—and that witnesses could testify that petitioner went by those nicknames." (*Id*. at 3 (quoting the Court's in-limine Order).)

To determine whether trial counsel was deficient for failing to object to the Government's use of Petitioner's nicknames, the Court must analyze its pretrial Order granting in part and denying in part the Petitioner's motion in limine. (Doc. 1-4.)  In its Order, the Court found the Government could elicit limited testimony about the nicknames because Petitioner had the nicknames while committing the crime at issue, and because the majority of witnesses knew him by those nicknames. (*Id*. at 10.)  Although the Court allowed this testimony, the Court found "evidence regarding the reason behind Defendant's nickname 'P' or 'Prince' and how that nickname corresponded to a rank and hierarchy within the Vice Lords" was substantially more prejudicial than probative of the charged offense. (*Id*.)  The Court reasoned that the "inner structure of the Vice Lords is a separate issue than a conspiracy to distribute heroin." (*Id*. at 11.)

In support of the § 2255 motion, Petitioner provides examples of when his nicknames were uttered in front of the jury. (Doc. 1-1.)  After reviewing these examples and the trial transcript as

a whole, the Court finds the Government did not use or emphasize the nicknames in a way that exceeded the pretrial Order. While the Court recognizes the nickname "the Prince" may have inherently "beat into the jury's minds that [Petitioner] was a high-ranking member of the gang" by the word's definition (Doc. 2 at 17), the Government never explained the reason behind Defendant's nickname or how the nickname corresponded to a rank or hierarchy within the Vice Lords. *See Morrissette v. Lebanon Corr. Inst.*, No. 1:19-CV-912, 2020 WL 6135666, at *14 (S.D. Ohio Oct. 19, 2020), *report and recommendation adopted sub nom. Morrissette v. Warden, Lebanon Corr. Inst.*, No. 1:19-CV-912, 2020 WL 6710812 (S.D. Ohio Nov. 16, 2020) ("The jury was not told the origin of the nickname and it was not used in an impugning manner. Although the nickname was used a significant number of times, this alone does not demonstrate the requisite prejudice to establish an ineffective-assistance-of-counsel claim.").

Instead, the Government used or elicited Petitioner's nicknames only when it was relevant to identify Petitioner. (*See, e.g.,* Doc. 1-12 at 31, 82, 88; Doc. 1-13 at 17, 121, 123–24, 184, 190; Doc. 1-14 at 8, 10–13, 15–20, 22–24, 26–29, 32–36, 44; Doc. 1-15 at 15–17, 169, 177, 179–81, 197–99.) For example, Police Sergeant Pat Curran, a member of a drug force in Chicago, testified that he received wire-phone intercepts that showed "a person named the Prince or P" was connected to a drug conspiracy in Tennessee. (Doc. 1-12 at 31.) Mr. Curran testified he began surveilling the phone, which was subscribed to the address of Petitioner. (*Id*. at 31–33.) DEA Agent William Wise then testified that this same number was saved in the phone of codefendants Heather and Jovani Robinson as "The P." (*Id*. at 82.) He also testified that the owner of the phone number identified himself as "Your prince" and "P" in outgoing messages. (*Id*. at 88.) DEA Agent Andrew Bergren was also able to confirm that Petitioner went by the nicknames of "P" and "Prince" in text messages. (Doc. 1-15 at 15–17.) During Petitioner's direct examination, he

8

testified that he did not go by the nicknames. Thus, on cross-examination of Petitioner, the Government impeached him by offering evidence that contradicted this testimony. (*Id*. at 169, 177, 197–199.) The uses of Petitioner's nicknames were relevant and inextricably intertwined with the Government proving Petitioner's identity and involvement in the drug conspiracy. *See United States v. Williams*, 158 F. App'x 651, 654–55 (6th Cir. 2005).

Petitioner's nicknames were also used when coconspirators testified that they knew Petitioner by his nicknames. (*See, e.g.*, Doc. 1-13 at 121, 190; Doc. 1-14 at 8.) Once again, using Petitioner's nicknames in this way was directly related to the Government proving Petitioner's involvement in the drug conspiracy. *See Williams*, 158 F. App'x at 654. And although the nicknames were used a significant number of times to identify Petitioner, the jury was not told the origin of the nicknames or how Petitioner's nicknames corresponded to a rank and hierarchy within the Vice Lords. *See Morrissette*, 2020 WL 6135666, at *14.

Moreover, choosing not to object to the use of nicknames is generally not "the sort of decision for the court to second-guess." *See Cosper v. Fitz*, No. 1:21-CV-114, 2021 WL 5813824, at *15 (E.D. Tenn. Dec. 7, 2021) (finding trial counsel's decision not to object to the use of a nickname was a matter of strategy that the court should not second-guess). The Court especially declines to second-guess trial counsel's decision not to object here because the Government did not exceed the Court's pretrial Order. (*See* Doc. 1-4 at 10.) Because the use of Petitioner's nicknames were permissible, Petitioner's trial counsel cannot be found ineffective for failing to object. *See Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) ("Counsel could not be unconstitutionally ineffective for failing to raise [a] meritless argument[]."); *see also Chapman v. United States*, 74 F. App'x 590, 593 (6th Cir. 2003) (stating that an attorney "is not required by the Constitution to raise frivolous defenses or arguments to avoid a charge of ineffective

9

representation"). "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

Petitioner also argues that his trial counsel's performance was deficient because she "uttered" or "elicited witnesses on cross-examination to respond with" Petitioner's nicknames "a shocking 236 times," which "almost amounts to conceding guilt." (Doc. 2 at 27.) Petitioner contends this repeated "utterance of the nicknames were not backed by reasonable trial strategy." (Doc 9 at 5.) The Government responds by arguing defense counsel intentionally uttered or elicited witnesses to say Petitioner's nicknames as a strategy "to argue the United States had mistakenly identified the wrong person." (Doc. 6 at 9.) In reply, the Petitioner argues it is incoherent and inconsistent for defense counsel to "aim to identify someone other than [Petitioner] as 'the Prince' while repeatedly referring to [Petitioner] as 'The Prince' h[er]self." (Doc. 9 at 9.)

It is apparent from the trial transcript that defense counsel's strategy was to raise reasonable doubt that Petitioner was the "P" or the "Prince" involved in the conspiracy. For example, in her opening statement, trial counsel said the following:

> Jovani and Heather Robinson are going to testify that Mr. Silas was a big-time drug dealer from Chicago, but you'll learn that it was Percy Richard who was the big-time drug dealer from Chicago. He had a lifestyle of a big-time drug dealer; Mr. Silas did not. . . . They are confused, and they want P to be Mr. Silas. It is up to you to decide whether their proof establishes that.

(Doc. 1-9 at 16–17.) She continued by saying,

> You'll learn from the evidence that the Robinsons did not know James Silas. They had talked with a guy named P, or Prince. It's the police who decided that P, or Prince, was James Silas. Now, Jovani and Heather were happy to ID Mr. Silas's photo, and they agreed to testify against him, but they weren't the ones who decided that they knew James Silas. It was law enforcement that decided that.

(*Id*. at 18.)

Trial counsel used this strategy throughout the trial. During the cross examination of Agent Wise, trial counsel highlighted evidence showing codefendant Percy Richard referred to himself as "Prince Pooh" in text messages and on Instagram. (Doc 1-12 at 125, 127.) She followed up by asking codefendants whether Richard was called "Prince Pooh" (Doc. 1-13 at 225–26; Doc. 1-15 at 206), and elicited evidence that Richard was the "big-time drug dealer" who codefendants were trying to protect (Doc. 1-13 at 6, Doc. 1-15 at 146–147). Trial counsel also questioned the unreliability of codefendant Heather Robinson's identification of Petitioner as "P" due to her lack of familiarity with him. (Doc. 1-13 at 172). In her closing argument, trial counsel said this to help solidify the defense theory:

> Agent Wise told you something very interesting. He told you what drug dealers do is, they try to hide their identities on the phone. They will get phone numbers in fictitious people's names. They will get phone numbers in other people's names. They don't get phone numbers in their own names because they don't want to be tracked. And what Mr. Silas believes and what I'm arguing to you is that that's exactly what happened here. P was able to access Silas's phone. It was the perfect way for him to hide his own identity. James Silas is not P. James Silas is P's patsy. He was the perfect patsy for a drug dealer. And if you look at what Mr. Silas was doing with the phone, that's clear. He used that phone for personal purposes. If he was a drug dealer, he would not take this fine phone he has had and use it for personal reasons and use the same phone for all these drug dealings. Drug dealers don't do that. Mr. Silas did not know those texts were there. He did not produce those texts.

(Doc. 1-10 at 17.)

"In reviewing a claim of ineffective assistance of counsel, courts should decline second-guessing an attorney's trial strategy." *Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007). The Supreme Court has made clear that counsel need not be perfect. *Harrington*, 562 U.S. at 110. "[T]here is no expectation that competent counsel will be a flawless strategist or tactician." *Id*. Instead, counsel must be "reasonably competent." *Id*. Petitioner bears the burden

11

Case 1:22-cv-00230-CLC-CHS    Document 13    Filed 09/09/25    Page 11 of 15
PageID #: 1022

to show that "counsel's representation was not merely below average, but rather that it fell below an objective standard of reasonableness." *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014). Here, trial counsel's tactical decisions are difficult to attack because under the circumstances, the defense theory to raise doubt that Petitioner was "Prince" or "P" "might be considered sound trial strategy." *See Tackett v. Trierweiler*, 956 F.3d 358, 374 (6th Cir. 2020) (citation omitted).

Further, although Petitioner's nicknames were used by his own counsel, "[t]his is probably a result of the common phenomenon that when someone is identified by a nickname early in a lengthy discourse, there is a tendency to use the nickname shortcut later in that discourse." *See Morrissette*, 2020 WL 6135666, at *14. Trial counsel referred to Petitioner as "Prince" or "P" only after the witnesses identified Petitioner as those nicknames first. (*See, e.g.*, 1-13 at 234.) For these reasons, the Court does not find that trial counsel provided deficient performance.

### 2. Prejudice

Petitioner argues that had the jury "not been constantly reminded that Petitioner held a high-ranking, powerful position within the Vice Lords, 'there is a reasonable probability that one juror would have struck a different balance' and voted to acquit [Petitioner]." (Doc. 2 at 26.)

As explained above, none of Petitioner's allegations establish that counsel's performance was deficient, meaning Petitioner fails to meet the burden for ineffective counsel. Moreover, Petitioner cannot establish prejudice. "Whether a petitioner can show prejudice depends in large part on the evidence in the case." *Storey v. Vasbinder*, 657 F.3d 372, 374 (6th Cir. 2011). In this case, the collective evidence against Petitioner was not weakly supported. *See Strickland*, 466 U.S. at 696. Petitioner fails to show a reasonable probability that the jury would not have convicted

him absent his attorney's allegedly deficient performance. *Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020). Accordingly, Petitioner's ineffective-assistance claim will be **DENIED**.

## B. Prosecutorial Misconduct

Petitioner next argues the Government committed prosecutorial misconduct during his trial "by circumventing the pretrial ruling prohibiting testimony pertaining to [Petitioner's] rank and hierarchy within the Mafia Insane Vice Lords." (Doc. 2 at 18.) He suggests that "the Government's constant reiteration of 'The Prince' or 'The P' to refer to [Petitioner] made it impossible for the jurors to comply with this Court's instruction. The references permeated every stage of trial such that the jurors could not reach a verdict in a fair and equitable manner." (*Id*. at 19.)

In response, the Government first asserts Petitioner procedurally defaulted this claim because he did not raise it on direct appeal. (Doc. 6 at 4 (citing *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.")).) Although Petitioner "has not even attempted to excuse his procedural default," the Government argues that his claim for prosecutorial misconduct is meritless, nevertheless. (*Id*.)

In reply, Petitioner argues he "may obtain review of his claim here because his ineffective assistance of counsel claim satisfies the 'cause' and 'prejudice' of his allegedly procedurally defaulted prosecutorial-misconduct claim." (Doc. 9 at 11.) He further argues his prosecutorial-misconduct claim has merit because "not only did the prosecutor's statements violate this Court's order in limine, but they are also improperly inflammatory." (*Id*.)

The Court will first determine whether Petitioner's claim for prosecutorial misconduct is procedurally defaulted. Generally, "claims not raised on direct appeal may not be raised on collateral review," such as a § 2255 motion. *Massaro v. United States*, 538 U.S. 500, 504 (2003);

13

*Moore v. Mitchell*, 708 F.3d 760, 804 (6th Cir. 2013). Nonetheless, a petitioner may raise a procedurally-defaulted claim if he can show good cause and actual prejudice regarding that default, or that he is "actually innocent."[3] *Bousley*, 523 U.S. at 622 (citations omitted). Excusing procedural default based on good cause and prejudice requires the defendant to meet an "intentionally high" bar because a collateral attack cannot substitute for a direct appeal. *Peveler v. United States*, 269 F.3d 693, 700 (6th Cir. 2001) (quoting *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000)). A petitioner shows good cause by "offering a sufficient excuse for their failure to timely raise a claim." *Wallace v. United States*, 43 F.4th 595, 602 (6th Cir. 2022) (citation omitted). "Ineffective assistance of counsel can constitute cause for a procedural default." *Huff v. United States*, 734 F.3d 600, 606 (6th Cir. 2013) (citation omitted). A petitioner shows prejudice by demonstrating he "would suffer prejudice if unable to proceed" with those claims. *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *Bousley,* 523 U.S. at 622)).

Here, Petitioner brings his prosecutorial-misconduct claim for the first time in his § 2255 petition. While ineffective assistance of counsel can establish good cause, the Court has found Petitioner did not receive such ineffective assistance of counsel. Therefore, because Petitioner fails to demonstrate good cause to excuse his procedural default, the prosecutorial-misconduct claim will be **DENIED**.

---

[3] "To establish actual innocence, petitioner must demonstrate that, '"in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him'" absent the constitutional error. *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)). Petitioner has not alleged that he is actually innocent so the Court need not address this path.

14

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Petitioner's § 2255 motion (Doc. 1). Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability ("COA") should be granted. A COA should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of a COA, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A § 2255 "claim does not merit a [COA] unless every independent reason to deny the claim is reasonably debatable." *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).

The Court finds that reasonable jurists could not conclude that Petitioner's claims deserve further review, as Petitioner has failed to make a substantial showing of the denial of a constitutional right and reasonable jurists would not debate the Court's finding that Petitioner is not entitled to relief under § 2255. Accordingly, a COA will not issue. It is therefore **CERTIFIED** that any appeal in this matter by Petitioner is not taken in good faith, and he may not proceed *in forma pauperis*. Fed. R. App. P. 24(a).

**AN APPROPRIATE ORDER WILL ENTER.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**